# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>    Respondent,<br><br>   v.<br><br>LELAND ALFRED JORDAN,<br><br>    Appellant. | No. 72728-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: March 13, 2017 |

TRICKEY, A.C.J. — Leland Jordan seeks to withdraw his guilty plea to felony harassment and bail jumping. Jordan argues that the superior court violated his constitutional right to counsel by failing to conduct a second colloquy regarding his desire to proceed pro se. Jordan also contends that his plea lacked a factual basis and the charging document was inadequate to apprise him of the essential elements of bail jumping. We affirm.

## FACTS

On September 23, 2013, the State charged Jordan with felony harassment based on an incident in which Jordan made threats to kill Dr. Sachita Shah and other medical staff at Harborview Medical Center.

At a hearing on October 16, 2013, Jordan announced his intention to waive his right to counsel and proceed pro se. Judge James Rogers engaged in a lengthy colloquy with Jordan, which included the nature of the crime, the maximum penalty, and the rights Jordan was waiving. Jordan also signed a written waiver of counsel. Judge Rogers found that Jordan's waiver was knowingly, intelligently, and voluntarily made, and discharged Jordan's court-appointed attorney.

At an omnibus hearing on December 6, 2013, Jordan asserted that the jail was not giving him access to discovery, and expressed confusion about how to file motions or request services from the Office of Public Defense. Judge Ronald Kessler explained the procedure to Jordan, stating, "You were told when you decided to represent yourself that you didn't know what you were doing . . . and you're going to be in trouble with it. You don't know what you're doing. And you're stuck with it."[1] Jordan responded, "But, I do know what I'm doing."[2]

On December 11, 2013, the State informed the court that Dr. Shah was on bedrest due to a high-risk pregnancy and would not be available to testify until February. Judge Rogers told the deputy prosecutor, "I'd have to seriously consider releasing Mr. Jordan if you want a continuance that long."[3] Jordan said, "I swear on my skin I will make all these appointments if you let me go."[4] Judge Rogers released Jordan on the condition that Jordan report daily to King County's Community Center for Alternative Programs (CCAP). Judge Rogers told Jordan, "So, your next [court] date will be Friday, January 17th at . . . 8:30."[5]

Jordan did not appear at the January 17 hearing. The State informed Judge Sean O'Donnell that Jordan had not reported to CCAP as required and his whereabouts were unknown. Judge O'Donnell issued a warrant for Jordan's arrest.

---

[1] 2 Report of Proceedings (RP) at 40.
[2] 2 RP at 40.
[3] 2 RP at 44.
[4] 2 RP at 45.
[5] 2 RP at 53.

On June 26, 2014, Jordan appeared in custody, having been arrested approximately a week earlier. Jordan immediately reminded the court, "Uh, you know–you know, I'm representing myself."[6] Judge Rogers discussed Jordan's previous release and stated, "[Y]ou failed to appear on January 17th, and that's when the warrant issued."[7] The State informed the court of its intention to charge Jordan with bail jumping. Judge Rogers explained to Jordan that bail jumping "means you didn't show up to court."[8]

At a second omnibus hearing on August 1, 2014, the State amended the information to add a charge of bail jumping. Jordan said, "I think it might be too late for me to defend myself pro se. I mean, I got 60 days. I've been waiting 45 days for the discovery."[9] The following exchange took place between Jordan and Judge Patrick Oishi:

> THE COURT: So, Mr. Jordan, I just want to be clear. I know Judge Kessler and Judge Rogers have both allowed you to go pro se. Is it still –
>
> MR. JORDAN: Yes.
>
> THE COURT: – your desire to represent yourself today?
>
> MR. JORDAN: Well, the fact of the matter is, it – it seems like it's going to be impossible for you – for me to represent myself. The – the Prosecutor hasn't been acknowledging the court orders. The Jail don't acknowledge the court orders. And so, therefore, I feel like I'm in a position where I just can't do it because it's just physically beyond my lack of ability to access certain things, not possible for me to do that. Now, they were supposed to give me a copy of discovery 45 days ago. They still haven't done it.[10]

---

[6] 2 RP at 56.
[7] 2 RP at 57.
[8] 2 RP at 63.
[9] 1 RP at 26.
[10] 1 RP at 27.

3

Jordan continued to argue about getting a copy of discovery. Judge Oishi asked Jordan again if he still wanted to proceed pro se.

> MR. JORDAN: I want to – yeah, I still want to do that. But, I want to do it in such a way where I can access some legal materials where I can fight. I don't want to be sitting up in a – in a cage somewhere and can't even see because I don't have glasses, and them failing to acknowledge court orders issued by the Court. . . . I don't think I could do it now. I only have, like, 65 days in, what, 20 days? I don't think I can prepare a meaningful defense in 20 days.
>
> THE COURT: Okay. So, are you saying you don't want to be pro se now?
>
> MR. JORDAN: I am saying –
>
> THE COURT: I don't want to waste any more time.
>
> MR. JORDAN: I'm saying – me neither.
>
> THE COURT: I just need an answer.
>
> MR. JORDAN: I'm saying I think you should dismiss this charge because, uh –
>
> THE COURT: I'm not going to –
>
> MR. JORDAN: – for their failure –
>
> THE COURT: – dismiss the charge, sir.
>
> MR. JORDAN: Okay. Well, how you going to – well, whatever you want to do; I guess it's up to you. I'm the best lawyer for me. And I'm –
>
> THE COURT: Are you –
>
> MR. JORDAN: – going to want to defend myself. I want certain accessible – I want access.[11]

The parties continued to discuss Jordan's access to discovery.

---

[11] 1 RP at 28-29.

4

THE COURT: Sir, I'm just asking you a straightforward —

MR. JORDAN: Yeah, okay.

THE COURT: — question. Do you —

MR. JORDAN: Yeah. Yeah.

THE COURT: Are you still wanting to represent yourself? I'm trying to enter —

MR. JORDAN: The will is —

THE COURT: — some orders.

MR. JORDAN: The will to represent myself is still there. However, if I'm not going to have no access to no legal materials, no pencils, no papers, no envelopes, it's — it would be virtually impossible for a person in my position to represent himself.

THE COURT: Okay.

MR. JORDAN: All right? If your court orders ain't going to work, like the last judge and the one before that, ain't no use in writing them.

THE COURT: Okay. Just to be clear, Judge Kessler and Judge Rogers have previously done colloquies with Mr. Jordan. They've allowed him to proceed pro se. I'm going to continue to allow Mr. Jordan to proceed pro se. What I'm going to do is I'm going to sign this waiver of counsel form.[12]

Jordan signed another written waiver of counsel reflecting the amended information, including the fact that both crimes carried a maximum sentence of five years.

Another hearing was held on August 11, 2014. Judge Oishi said, "Mr. Jordan, we are here on apparently your motion. And so, can you briefly tell me what it is you're asking?"[13]

---

[12] 1 RP at 29-30.
[13] 1 RP at 39. Jordan's motion is not part of the record before this court.

MR. JORDAN: Well, originally I – I – well, originally I had made a motion to have a – have an attorney assigned. But, in the time since I made the motion I've been provided some access to some – to some legal access. And – and now I –

THE COURT: Good.

MR. JORDAN: – just don't feel it'd be feasible under the circumstances as they are at the present time –

COURT: What's not feasible?

MR. JORDAN: – for me to have an attorney. Huh?

THE COURT: I'm sorry, what's not feasible?

MR. JORDAN: I don't think it'd be feasible for me to have an – have an attorney right now. All he could do is ask for a continuance, and that would just – I mean, you know, I know – I realize that that would condemn me to doing more time that I've already done on a charge that really – so –

THE COURT: I – I just want to be clear. What's your request today?

MR. JORDAN: My request is I don't have a request. I want to submit some motions first and give you an – a chance to rule on some motions before I make any other motions.

[PROSECUTOR]: And, Your Honor, if I could provide the Court with some additional information.

THE COURT: Yes.

[PROSECUTOR]: Mr. Jordan and I met at the jail last week. As the Court knows, when he was last before the Court, he mentioned wanting to plead guilty. We discussed that briefly. He then had several questions relating to scoring as well as withdrawing previous misdemeanor guilty pleas, which I simply can't advise him on. At that point we discussed whether or not he might want an attorney, and he indicated that he did. And so, that's why we set the court today.

. . . .

. . . When I spoke with him this morning, I understand that he no longer wishes to ask the Court for an attorney.

6

. . . .

MR. JORDAN: I don't – the fact – I don't – I don't really need an attorney. What I need is somebody to make me copies and do a little running – running around things for me. Uh –

THE COURT: Yeah. And it sounds like you're requesting essentially a paralegal, and you don't have a right to a paralegal. I'm going to deny that request.

MR. JORDAN: Okay.[14]

Trial commenced on August 26, 2014, before Judge Monica Benton. The court held a CrR 3.5 hearing regarding the admissibility of Jordan's post-arrest statements.

The following day, Jordan entered an Alford[15] plea to the charges in the amended information. As part of the plea agreement, the State permitted Jordan to challenge the State's calculation of his offender score at sentencing. Judge Benton sua sponte appointed standby counsel to help Jordan review nearly 200 pages of criminal history provided by the State.

On October 24, 2014, Judge Benton sentenced Jordan to 51 months on each count, based on an offender score of 10. Jordan appeals.

## ANALYSIS

### Waiver of Right to Counsel

Jordan contends that he was deprived of his constitutional right to counsel when he was permitted to represent himself absent a knowing, intelligent, and voluntary waiver of his right to counsel.

---

[14] 1 RP at 39-41.
[15] North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee a criminal defendant the right to self-representation. Faretta v. California, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); State v. Luvene, 127 Wn.2d 690, 698, 903 P.2d 960 (1995). However, the right to self-representation is not self-executing. State v. Woods, 143 Wn.2d 561, 586, 23 P.3d 1046 (2001). A criminal defendant who desires to waive the right to counsel and proceed pro se must make an affirmative demand, and the demand must be unequivocal in the context of the record as a whole. Luvene, 127 Wn.2d at 698-99.

Furthermore, a waiver of the right to counsel must be made knowingly, voluntarily, and intelligently. City of Tacoma v. Bishop, 82 Wn. App. 850, 855, 920 P.2d 214 (1996). "While there are no steadfast rules for determining whether a defendant's waiver of the right to assistance of counsel is validly made, the preferred procedure for determining the validity of a waiver involves the trial court's colloquy with the defendant, conducted on the record." State v. Modica, 136 Wn. App. 434, 441, 149 P.3d 446 (2006).

Here, it is undisputed that Jordan unequivocally waived his right to counsel on October 16, 2013. However, Jordan contends that a subsequent "significant change in circumstances" rendered his waiver invalid and the court was required to procure a new waiver.[16]

"[A] valid waiver of the right to assistance of counsel generally continues throughout the criminal proceedings, unless the circumstances suggest that the

---

[16] Appellant's Opening Br. at 11 (boldface omitted).

waiver was limited." Modica, 136 Wn. App. at 445. Thus, a trial court is not ordinarily required to inquire about a party's continuing desire to proceed pro se at later stages of the proceeding. Modica, 136 Wn. App. at 445 (citing Arellanes v. United States, 302 F.2d 603, 610 (9th Cir.1962)). However, a new inquiry into self-representation may be required if "circumstances have sufficiently changed since the date of the Faretta inquiry that the defendant can no longer be considered to have knowingly and intelligently waived the right to counsel." United States v. Hantzis, 625 F.3d 575, 581 (9th Cir.2010).

Jordan argues that the significant lapse in time between his original waiver on October 16, 2013 and his guilty plea on August 27, 2014 constituted such a change in circumstances. Jordan relies on a federal case, Schell v. United States, 423 F.2d 101 (7th Cir. 1970), in support of his claim. But the facts of Schell are distinguishable. There, the court granted a 20-year-old defendant's request to proceed pro se. The court informed the defendant of the maximum sentence he faced as an adult but otherwise did not adequately advise the defendant of the consequences of his decision. At sentencing, six months later, the court sentenced the defendant as a juvenile – which carried a greater maximum penalty – without inquiring whether the defendant wanted the assistance of counsel. The Seventh Circuit noted the lapse in time but determined that the defendant's original waiver was invalid primarily because of the defendant's youth and inexperience and the original waiver's questionable validity. Schell, 423 F.2d at 103.

Here, in contrast, Jordan was 62 years old and had extensive experience with the criminal justice system. Jordan told the court that he had represented

himself four times and that he was "the best lawyer."[17] There was also no question about the validity of Jordan's original waiver. Furthermore, the lapse in time was primarily due to the fact that Jordan failed to appear for court hearings for over six months. Even after Jordan was taken back into custody, he repeatedly asserted his desire to continue to represent himself. Finally, while the delay in Schell occurred between trial and sentencing, here, Jordan was sentenced within a reasonable time after his guilty plea and was provided standby counsel for sentencing. We find that, under the circumstances of this case, the passage of time did not necessitate a new colloquy.

Jordan next contends that the superior court was required to conduct a new colloquy after the State added an additional charge of bail jumping. He claims that neither the State nor the court advised him of the maximum penalty he faced on a bail jumping conviction. But the record does not support this claim. After the State amended the information, Jordan signed an amended waiver of counsel in which he acknowledged that the maximum penalty for both charges was five years.

Moreover, we rejected the claim that the filing of new charges necessitates a new colloquy in Modica. In Modica, the defendant executed a valid waiver of counsel. Several days later, the State amended the information to add an additional charge. The trial court attempted to discourage the defendant from proceeding pro se, but did not inform him of the maximum penalty associated with the newly added charge. The defendant asserted his continuing desire to represent himself. This court held:

---

[17] 2 RP at 17.

> [T]he trial court here was not required to inquire as to Modica's continuing wish to waive his right to assistance of counsel. Nevertheless, it did so. Four days after the information was amended to add the tampering with a witness charge, the trial court queried Modica about whether he wished to revoke his earlier waiver, and again advised him not to proceed pro se. The next day, which was the day before trial began, the trial court again asked Modica if he wished to proceed pro se. The trial court was not required to sua sponte engage Modica in a second full colloquy in which it informed him of the new charge's maximum penalty.
>
> The trial court did not err by not engaging in another full colloquy informing Modica of the consequences of proceeding pro se and the maximum penalties associated with the witness tampering charge. No such colloquy was required. The trial court's sua sponte efforts to confirm Modica's continuing desire for self-representation, which continued up to the eve of trial, sufficiently guaranteed that his Sixth Amendment rights were preserved.

Modica, 136 Wn. App. at 446 (internal footnotes omitted).

Finally, Jordan argues that the superior court was obligated to conduct another colloquy after he made equivocal statements about wanting counsel reappointed.

But "[o]nce an unequivocal waiver of counsel has been made, the defendant may not later demand the assistance of counsel as a matter of right since reappointment is wholly within the discretion of the trial court." State v. DeWeese, 117 Wn.2d 369, 376-77, 816 P.2d 1 (1991). And Jordan was unwavering in his desire to represent himself. While he stated that it "seems like it's going to be impossible . . . for me to represent myself,"[18] the record is clear that Jordan was primarily upset that the jail was not providing him adequate access to discovery. When Judge Oishi asked Jordan, "So, are you saying you don't want to be pro se

---

[18] 1 RP at 27.

now?"[19]  Jordan responded, "The will to represent myself is still there."[20]

Approximately a week later Jordan filed a motion for appointment of counsel, but subsequently revoked that request, clarifying that what he really wanted was a paralegal or assistant, not an attorney. The superior court did not abuse its discretion in allowing Jordan to continue pro se without conducting an additional colloquy.

### Factual Basis for the Plea

Jordan contends that there was an insufficient factual basis to support his plea to the felony harassment charge. Under CrR 4.2(d), a trial court must be satisfied that there is a factual basis for a defendant's guilty plea. This is a procedural requirement that is not constitutionally mandated. State v. Branch, 129 Wn.2d 635, 642, 919 P.2d 1228 (1996). "Ordinarily, when a defendant pleads guilty, the factual basis for the offense is provided at least in part by the defendant's own admissions." State v. D.T.M., 78 Wn. App. 216, 220, 896 P.2d 108 (1995). However, in an Alford plea, where the defendant does not admit guilt, but rather acknowledges the strength of the State's evidence to convict, the court must establish an entirely independent factual basis for the plea. D.T.M., 78 Wn. App. at 220.

A trial court may look to any reliable source to determine that there is a factual basis for a guilty plea. In re Pers. Restraint of Fuamaila, 131 Wn. App. 908, 924, 131 P.3d 318 (2006). One such source is the certification of probable cause.

---

[19] 1 RP at 29.
[20] 1 RP at 30.

No. 72728-1-I / 13

See State v. Osborne, 102 Wn.2d 87, 95, 684 P.2d 683 (1984) (prosecutor's factual statement). In determining whether a factual basis exists for a plea, the trial court need not be convinced beyond a reasonable doubt that the defendant is in fact guilty. State v. Newton, 87 Wn.2d 363, 370, 552 P.2d 682 (1976). Rather, a factual basis exists if there is sufficient evidence for a jury to conclude that the defendant is guilty. Newton, 87 Wn.2d at 370.

A defendant commits felony harassment if he or she knowingly threatens "to kill the person threatened or any other person" and the person is placed in "reasonable fear that the threat will be carried out." RCW 9A.46.020(1)(b), (2)(b)(ii). The information charged that Jordan "knowingly and without lawful authority, did threaten to cause bodily injury immediately or in the future to Dr. Sachita Shah, by threatening to kill Cynthia Ruiz-Seitzinger, Diane Fullerswitzer, Levena Barlow, Sachita Shah and Vincent Smith, and the words or conduct did place [Dr. Shah] in reasonable fear that the threat would be carried out."[21]

In his guilty plea statement, Jordan stated, "I agree that the court can review the probable cause certification [and] prosecutor's supplemental summary to find a factual basis for th[e] plea and for sentencing."[22] The certification of probable cause provided:

> Nurse Cynthia Ruiz-Seitzinger explained to Mr. Jordan that she was going to need a blood sample from him. Mr. Jordan yelled obscenities at Nurse Ruiz-Seitzinger stating he was "sick of the establishment and being judged." Mr. Jordan threatened to strangle Nurse Ruiz-Seitzinger if she touched him. Jordan yelled obscenities and referenced the recent Seattle bus shooting and the Navy shipyard shooting – adding that he would "get a gun at a drug house

[21] CP at 16.
[22] CP at 91.

13

and come back and there won't be a soul left standing." Mr. Jordan – an African American – also stated, "Those niggers got it right . . . bam, bam, bam." Nurse Ruiz-Seitzinger said Mr. Jordan made multiple statements similar to the ones described above.

[Electrocardiogram] technician, Levena Barlow witnessed Mr. Jordan making the threats of violence toward the hospital staff members, including the threat to carry out a similar act of the Naval Shipyard shooting in Washington DC as well as the downtown Seattle shooting of the Metro bus driver. Barlow said Mr. Jordan was very specific on using an AK47 and "was justifying his actions with racism and (his) untreated medical condition." Barlow also stated that a pair of scissors and a cell phone were removed from Mr. Jordan's person at the point that he was restrained by Hospital security.

Nurse Diane Fullerswitzer said Mr. Jordan was very threatening and at one point, stated to her and the other staff, that if he did not get his pain medications he was going to "beat all" their asses. Mr. Jordan then told the nursing staff that he would come back and "shoot everybody" making reference to multiple recent shootings and added that "black men snap" apparently justifying the Naval shipyard shooting. Mr. Jordan added, "See, that is what happens if I don't get what I want."

Nurse Vincent Smith was also assisting in the care of Mr. Jordan and stated that Mr. Jordan yelled profanities and made violent threats toward him – including, "I'm going to beat your fucking ass" and "You saw the guy who shot up the bus downtown, you saw the guy who shot up the Navy shipyard . . . well I'm about to snap and I'm going to get a gun and come here and shoot everybody."

Doctor Sachita Shah also witnessed Mr. Jordan's threatening behavior. Dr. Shah felt threatened when Mr. Jordan stated, "I'm going to get an AK47 and come back and kill all of you motherfuckers . . . just like the navy yard." Doctor Shah stated she and her staff feared that Mr. Jordan could actually carry out his plan.[23]

Jordan argues that the certification of probable cause does not provide a factual basis to conclude he threatened Dr. Shah. He argues that the evidence showed only that Dr. Shah witnessed his threats, not that she was the target of the

---

23 Clerk's Papers (CP) at 4.

threats. But the evidence showed that Dr. Shah was present when Jordan threatened to get a gun and "come back and kill all of you motherfuckers."[24] Thus, it was reasonable for a jury to conclude that "all of you" included Dr. Shah.

Jordan asserts the evidence showed only that Dr. Shah feared Jordan "could" carry out his threat to kill, not that she feared he "would" do so.[25] But RCW 9A.46.020(1)(b) requires that the State prove that the person threatened is placed in "reasonable fear that the threat will be carried out." Dr. Shah stated she felt threatened by Jordan's statements. Moreover, in the context of making the threats, Jordan specifically referenced two recent, high-profile public shootings. This constitutes sufficient evidence from which a trier of fact could have concluded that Dr. Shah had a reasonable fear that Jordan planned to shoot her or other staff members. See, e.g., State v. E.J.Y., 113 Wn. App. 940, 953, 55 P.3d 673 (2002) (evidence was sufficient for a jury to find that a victim's fear was reasonable when the defendant told the victim, "'You're going to have another Columbine around here, you guys better watch out,'" and the victim testified that "'I was concerned that [the defendant] was making a threat that he could come back in and cause violence.'" (emphasis added)).[26]

---

[24] CP at 4.

[25] Appellant's Opening Br. at 24-25.

[26] In a related claim, Jordan asserts that Washington's felony harassment statute, RCW 9A.46.020(1), violates the First Amendment to the United States Constitution because it does not require proof that the speaker subjectively intended to communicate a threat. But the Washington Supreme Court has repeatedly rejected this claim, most recently in State v. Trey M., 186 Wn.2d 884, 893-94, 383 P.3d 474 (2016).

Sufficiency of Charging Document

Jordan challenges the sufficiency of the information charging bail jumping. He contends the information failed to allege that he knew he was supposed to appear in court on a specific date.

A charging document must include a crime's essential elements in order to notify the "accused of the nature and cause of the accusation." State v. Kjorsvik, 117 Wn.2d 93, 97, 812 P.2d 86 (1991). The purpose of this rule is to give the accused proper notice of the nature of the crime so that he or she can prepare an adequate defense. Kjorsvik, 117 Wn.2d at 101. Where, as here, a defendant challenges the information after the verdict, we construe the document liberally in favor of its validity. Kjorsvik, 117 Wn.2d at 105. In applying this liberal construction standard, we read the words in the charging document as a whole and consider whether the necessary facts appear in any form. Kjorsvik, 117 Wn.2d at 109. If they do, we consider whether the defendant was "nonetheless actually prejudiced by the inartful language which caused the lack of notice." Kjorsvik, 117 Wn.2d at 105-06. To analyze actual prejudice, we "may look beyond the face of the charging document to determine if the accused actually received notice of the charges he or she must have been prepared to defend against." Kjorsvik, 117 Wn.2d at 106. We review de novo claims that an information omitted essential elements of a charged crime. State v. Pittman, 185 Wn. App. 614, 619, 341 P.3d 1024 (2015).

RCW 9A.76.170(1) provides that a person "having been released by court order or admitted to bail with knowledge of the requirement of a subsequent

personal appearance before any court of this state . . . and who fails to appear . . . as required is guilty of bail jumping."

Here, the amended information provided:

> That the defendant Leland Alfred Jordan in King County, Washington, on or about January 17, 2014, being charged with Felony Harassment, a Class C felony, and having been released by court order with knowledge of the requirement of a subsequent personal appearance before King County Superior Court, a court of the [S]tate of Washington, did fail to appear as required[.]
>
> Contrary to RCW 9A.76.170(1), (3)(c), and against the peace and dignity of the State of Washington.[27]

The information thus included the date that Jordan failed to appear: January 17, 2014. And the information included the fact that the State had to prove Jordan had knowledge of the requirement to appear. Construing the information liberally and reading it in a common sense manner, we conclude that the allegedly missing element of Jordan's knowledge of the particular date that he had to appear is implied by the information. Because the information was sufficient to give Jordan notice of the essential elements of bail jumping, we need not determine whether Jordan suffered prejudice.[28]

## Statement of Additional Grounds

Jordan raises four additional claims in his pro se statement of additional grounds. None merit reversal.

---

[27] CP at 93.

[28] In support of his argument, Jordan relies on State v. Cardwell, 155 Wn. App. 41, 47, 226 P.3d 243 (2010), which held that "[i]n order to meet the knowledge requirement of the statute, the State is required to prove that a defendant has been given notice of the required court dates." But Cardwell is inapposite because it involved the sufficiency of the evidence, not the adequacy of the information.

17

First, Jordan challenges the sufficiency of the information charging felony harassment. Jordan appears to suggest that he was confused as to whether the State was alleging Dr. Shah was the victim of his harassment or merely a witness. But the information contained all of the essential elements of the crime. Moreover, contrary to Jordan's claim, the State provided a bill of particulars outlining the facts the State intended to prove.

Next, Jordan contends that the court violated his right to a speedy trial by granting a two-month continuance due to Dr. Shah's unavailability. CrR 3.3(f)(2) allows a court to continue the trial date "when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." The decision whether to grant or deny a motion to continue lies within the sound discretion of the court and will not be disturbed absent a showing that it was manifestly unreasonable or exercised on untenable grounds or for untenable reasons. State v. Kenyon, 167 Wn.2d 130, 135, 216 P.3d 1024 (2009). The unavailability of a material State witness is a valid ground for continuing a criminal trial where a valid reason exists for the unavailability, the witness will become available within a reasonable time, and the defendant is not substantially prejudiced. State v. Nguyen, 68 Wn. App. 906, 914, 847 P.2d 936 (1993). Here, Jordan does not identify how he was prejudiced by the continuance. Jordan fails to establish that the court abused its discretion.

Jordan argues that he was not timely provided discovery because the State failed to give him a copy of the video recording of his arrest until two weeks before trial. Jordan asserts that he planned to defend on the grounds of "temporary

18

insanity" until he viewed the video, at which point he decided to enter an <u>Alford</u> plea.[29] But Jordan fails to establish how he was prejudiced by this alleged error.

Finally, Jordan challenges the calculation of his offender score, arguing that his misdemeanor convictions should not prevent his older felony convictions from washing out. But class B felony convictions count toward the offender score unless the defendant has spent at least ten consecutive years in the community "without committing <u>any</u> crime that subsequently results in a conviction." RCW 9.94A.525(2)(b) (emphasis added). Class C felony convictions will count toward the offender score unless the defendant has spent at least five consecutive years in the community "without committing <u>any</u> crime that subsequently results in a conviction." RCW 9.94A.525(2)(c) (emphasis added). "[M]isdemeanors as well as felony convictions interrupt the . . . wash-out period." <u>In re Pers. Restraint of Higgins</u>, 120 Wn. App. 159, 164, 83 P.3d 1054 (2004).

Jordan does not dispute the State's recitation of his criminal history. And none of Jordan's fourteen felony convictions wash out because at no time has Jordan spent five years in the community without committing any crimes. Jordan's challenge to his offender score fails.

Affirmed.

Trickey, ACJ

WE CONCUR:

_Leach, J._

---

[29] Statement of Additional Grounds at 3.

COURT OF APPEALS DIV 1 STATE OF WASHINGTON FILED 2017 MAR 13 AM 9:32